**UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FREEDOM FROM RELIGION | § | |
| FOUNDATION, INC., JANE DOE, | § | |
| JOHN ROE, and JANE NOE | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | **CASE NO. 4:17-cv-881** |
| | § | |
| JUDGE WAYNE MACK and | § | |
| MONTGOMERY COUNTY, TEXAS | § | |
|     Defendants. | § | |

**RESPONSE IN OPPOSITION TO DEFENDANT
MONTGOMERY COUNTY'S MOTION TO DISMISS**

Plaintiffs submit the accompanying brief in opposition to Defendant Montgomery County's Motion to Dismiss ("MTD") (Dkt. 29). Plaintiffs' brief establishes that: (1) as alleged in the First Amended Complaint ("FAC") (Dkt. 22), Plaintiffs have standing to pursue the requested relief against Defendant Montgomery County, (2) the Plaintiffs have met their initial burden at the pleadings stage as to the plausibility of their claims and right to relief, and (3) that the First Amended Complaint presents a cause of action against Montgomery County under the theory of municipal liability. As to municipal liability, Plaintiffs have alleged facts sufficient to conclude that the challenged courtroom prayer practice is a written policy—or at least an established custom or practice—within Montgomery County's Justice of the Peace Precinct 1 court, that the County had actual and constructive knowledge of that policy such that the County bears ultimate responsibility for it, and that the policy is a moving force behind the deprivation of Plaintiffs' constitutional rights. Ultimately, Plaintiffs ask this Court to deny Defendant Montgomery County's Motion to Dismiss and allow this case to proceed to discovery.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STANDARD OF REVIEW ......................................................................................................2

ARGUMENT ........................................................................................................................3

I.  Plaintiffs have standing to challenge the prayer practice.  ....................................................3

II.  Defendants fall far short of demonstrating beyond doubt that Plaintiffs are not entitled to relief on any set of facts. .................................................................................................8

III.  Montgomery County is liable for the clergy-led prayer practice established within its Justice of the Peace Precinct 1 court.  .............................................................................10

A.  Plaintiffs have alleged facts sufficient to find an official courtroom prayer policy exists, by written policy and by persistent, widespread pattern or custom.  ...............11

B.  Plaintiffs have alleged facts sufficient to find that the County had actual and constructive knowledge of the official courtroom prayer practice and alternatively that Judge Mack exercised policymaking authority in implementing the courtroom prayer practice.  ................................................................................................16

C.  The courtroom prayer practice is a moving force behind the deprivation of Plaintiffs' constitutional rights.  .........................................................................................22

CONCLUSION ...................................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) ...........................................................................................11, 14

*Barr v. City of San Antonio*,
No. 06-CV-261, 2006 WL 2322861 (W.D. Tex. 2006) ........................................13–14

*Bennett v. City of Slidell*,
728 F.2d 762 (5th Cir. 1984) ...............................................................................17–20

*Bennett v. Pippin*,
74 F.3d 578 (5th Cir. 1996) .........................................................................................19

*Bigford v. Taylor*,
834 F.2d 1213 (5th Cir. 1988) .....................................................................................21

*Carr v. Montgomery County*,
59 F. Supp. 3d 787 (S.D. Tex. 2014) ...........................................................................15
No. H-13-2785, 2015 WL 5307673 (S.D. Tex. Sept. 10, 2015) ...................................15

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ................................................................................................16–17

*Cinel v. Connick*,
15 F.3d 1338 (5th Cir. 1994) .......................................................................................12

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) .......................................................................................................5

*Club Retro, LLC v. Hilton*,
568 F.3d 181 (5th Cir. 2009) .........................................................................................2

*County of Allegheny v. American Civil Liberties Union*,
492 U.S. 573 (1989) .......................................................................................................3

*Familias Unidas v. Briscoe*,
619 F.2d 391 (5th Cir. 1980) .......................................................................................19

*Foremaster v. City of St. George*,
882 F.2d 1485 (10th Cir.1989) .....................................................................................3

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ...................................................................................................5, 6

*Grandstaff v. City of Borger*,
767 F.2d 161 (5th Cir. 1985) .................................................................................22

*Harvey v. Montgomery County*,
881 F. Supp. 2d 785 (S.D. Tex. 2012) ...........................................................13, 15

*Jett v. Dallas Indep. Sch. Dist.*,
491 U.S. 701 (1989) ...............................................................................................16

*Jennings v. Patterson*,
488 F.2d 436 (5th Cir. 1974) .................................................................................11

*Johnson v. Moore*
958 F.2d 92 (5th Cir. 1992) ...................................................................................21

*Krueger v. Reimer*,
66 F.3d 75 (5th Cir. 1995) ...............................................................................20–21

*Lee v. Weisman*,
505 U.S. 577 (1992) ...............................................................................................10

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) .................................................................................................9

*Lowrey v. Texas A & M Univ. Sys.*,
117 F.3d 242 (5th Cir. 1997) ...................................................................................9

*Lynch v. Donnelly*,
465 U.S. 668 (1984) .................................................................................................3

*Marsh v. Chambers*,
463 U.S. 783 (1983) .................................................................................................8

*McCartney v. First City Bank*,
970 F.2d 45 (5th Cir. 1992) .....................................................................................2

*Meese v. Keene*,
481 U.S. 465 (1987) .................................................................................................5

*Monell v. Dept. of Social Servs. of City of New York*,
436 U.S. 658 (1978) ...............................................................................10–22 (passim)

*Monroe v. Pape*,
365 U.S. 167 (1961) ...............................................................................................10

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ......................................................................................5, 6

*Murray v. City of Austin*,
947 F.2d 147 (5th Cir. 1991) .............................................................................3

*Natural Arch & Bridge Soc'y v. Alston*,
209 F. Supp. 2d 1207 (D. Utah 2002) ................................................................7

*Norris v. Hearst Trust*,
500 F.3d 454 (5th Cir. 2007) ............................................................................12

*Paton v. United Parcel Service, Inc.*,
910 F. Supp. 1250 (S.D. Tex. 1995) ...................................................................2

*Peterson v. City of Ft. Worth*,
588 F.3d 838 (5th Cir. 2009) ......................................................................11, 13

*Piotrowski v. City of Houston*,
237 F.3d 567 (5th Cir. 2001) ...........................................................11, 13, 17, 22

*Rhode v. Denson*,
776 F.2d 107 (5th Cir. 1985) .......................................................................21–22

*Saladin v. City of Milledgeville*,
812 F.2d 687 (11th Cir.1987) .............................................................................3

*Starstead v. City of Superior*,
533 F. Supp. 1365 (W.D. Wis. 1982) ...............................................................14

*Stokes v. Gann*,
498 F.3d 483 (5th Cir. 2007) ..............................................................................2

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) ............................................................................................6

*Texas Democratic Party v. Benkiser*,
459 F.3d 582 (5th Cir. 2006) ..............................................................................7

*Tinoco v. Raleeh*,
2006 WL 27287 (E.D. Tex. 2006) ....................................................................21

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
454 U.S. 464 (1982) ............................................................................................3

*Webster v. City of Houston*,
735 F.2d 838 (5th Cir. 1984) ....................................................................11–13, 16–18

*Woodard v. Andrus*,
419 F.3d 348 (5th Cir. 2005) ....................................................................2, 9


## STATUTES

42 U.S.C. § 1983 ....................................................................10–16, 21, 23


## RULES

FED. R. CIV. P. 12(b)(6) ....................................................................2

FED. R. CIV. P. 12(d) ....................................................................2

## INTRODUCTION

For over three years, there has been a well-established policy within Montgomery County's Justice of the Peace Precinct 1 court that each court session open with a clergy-led prayer. Prior to the filing of this lawsuit, the prayer practice was the subject of an inquiry by the Texas State Commission on Judicial Conduct, briefing by the office of the Lieutenant Governor, and a written opinion by the Texas Attorney General. Defendant Judge Mack has advertised and held three well-attended prayer breakfast fundraisers within Montgomery County that focused on the defense and maintenance of this courtroom prayer practice. Each step of the way, the prayer practice has received extensive media attention that has called into question the constitutional propriety of subjecting every litigant, attorney, and member of the public who sets foot within the Precinct 1 court to clergy-led prayer. Now, Defendant Montgomery County, the entity bearing ultimate responsibility for the Justice of the Peace Precinct 1 court, moves to dismiss this lawsuit on the grounds that the County is somehow not liable for the long-established policy and practice of its governmental subunit.

Plaintiffs, who have experienced the deprivation of their constitutional rights through direct unwelcome contact with Defendants' prayer practice, come now before this Court seeking relief. They ask that the Court reject the County's claims that there is no official policy at work here and alternatively that somehow this practice came into being without overt approval or at least silent acquiescence from the County's policymakers. The County offers no other plausible origin story, but what other explanation could there be? The Court need not speculate, for at this early stage of litigation, Plaintiffs have more than met their burden to move forward with discovery and demonstrate the County's liability. Indeed, the County's knowledge and involvement is already apparent. The County's Motion to Dismiss should be denied in full.

## STANDARD OF REVIEW

The same standard of review applies to all arguments made or incorporated by Montgomery County ("Defendant") in its Motion to Dismiss Pursuant to Rule 12(b)(1) and Rule 12(b)(6) ("MTD") (Dkt. 29). The Court must accept all well-pleaded facts as true and view those facts in the light most favorable to Plaintiffs. *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007). The Court must also draw all reasonable inferences from well-pleaded facts in favor of Plaintiffs. *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005) ("[T]he complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff.").

In a motion under FED. R. CIV. P. 12(b)(6), "the court may not look beyond the four corners of the plaintiff's pleadings." *Paton v. United Parcel Service, Inc.*, 910 F. Supp. 1250 (S.D. Tex. 1995) (citing *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992)). In this case, Defendant has incorporated by reference matters outside the pleadings.[1] None of Defendant's newly presented matters are proper for consideration at the motion to dismiss stage. Plaintiffs continue to decline to brief the Court on these improperly introduced matters, as they did in their response to Defendant Mack's Motion to Dismiss (see Dkt. 28 at 2). If the Court does not exclude the matters introduced by Defendant, then Defendant's motion "must be treated as one for summary judgment under Rule 56" and all parties must be given a reasonable opportunity to present additional material pertinent to those matters. FED. R. CIV. P. 12(d). By

---

[1] Specifically, Defendant "incorporates by reference the arguments and authorities contained in Mack's Motion to Dismiss, Section II. (Doc. 24, ppg. 12 through 20, inclusive) and the arguments and authorities contained in TCLE's Memorandum, Section IV. (Doc. 15-3, ppg. 10 through 14, inclusive)." MTD at 12. These incorporated arguments include a number of claims about other court practices the Defendants perceive as "prayers" analogous to their chaplain-led prayer practice. At the very least, Defendant incorporates claims that the U.S Supreme Court opens each session "with a prayer," that similar phrases that open other federal courts and the Texas Supreme Court are prayers, that the oath taken by some prospective jurors and witnesses ("So help you God") constitutes "a prayer for divine assistance," and a number of other expositions into the history of religious influence on our judicial system. Additionally, Plaintiffs understand Defendant as having intended to incorporate pages 10–14 of Docket 15-5, which includes additional newly introduced matters. None of these other court practices are proper for consideration at this stage of litigation.

electing to defer their response to newly introduced matters and arguments on the merits for when they are properly before the Court, Plaintiffs do not concede the Defendants' arguments on the merits or accept the validity, applicability, or admissibility of the newly introduced matters.

## ARGUMENT

I.     **Plaintiffs have standing to challenge the prayer practice.**

Defendant Montgomery County first incorporates by reference Defendant Mack's Motion to Dismiss (Dkt. 24) pages 6–12, in which he argues that Plaintiffs have not suffered an injury in fact and have not established future harm that is "certainly impending." These standing concerns are fanciful and do not follow from established case law. They should be rejected.

Though the Fifth Circuit has recognized that "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases," it has ruled that direct, personal contact with a challenged religious endorsement confers standing. *E.g. Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991) (finding plaintiff who lived in city had standing to challenge inclusion of Latin cross in city's insignia) (quotation omitted). The court described this type of standing as "general standing principles." *Id.* (citing *Foremaster v. City of St. George*, 882 F.2d 1485, 1490–91 (10th Cir.1989) ("allegations of direct, personal contact [with municipal logo] suffices as non-economic injury") *cert. denied,* 495 U.S. 910 (1990); *Saladin v. City of Milledgeville*, 812 F.2d 687, 692–93 (11th Cir.1987) (receipt of city correspondence and proclamation bearing challenged seal sufficient to confer standing)). The *Murray* court "attach[ed] considerable weight to the fact that standing has not been an issue in the Supreme Court in similar cases," *id.* (citing *Lynch v. Donnelly*, 465 U.S. 668 (1984) (deciding on merits challenge to crèche displayed in private park from community residents and the ACLU); *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989) (deciding on merits

challenge to crèche and menorah display in county courthouse by several community residents and the ACLU)), and expressly distinguished those cases from *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982), where the plaintiffs "learned of challenged conduct through the media and did not live in or near the alleged offending state . . . ." *Id.* This Court should reject Defendants' invitation to adopt the novel position that direct, personal contact with religious promotion does not confer standing to bring an Establishment Clause claim.

In this case, the individual plaintiffs have all had direct, personal exposure to the challenged prayer practice. *See* FAC ¶¶ 9–11, 26, 36, 57–59. Subsequent to Plaintiffs filing their Response to Defendant Mack's Motion to Dismiss, attorney John Roe has suffered additional harm, through direct, personal exposure to the prayer practice on three additional occasions, which included appearances before Judge Mack to represent ten different clients. *See* Supplemental Declaration of John Roe (Exhibit C) ¶¶ 3–4. Attorney Roe further alleges that on at least one of these occasions a court employee coerced him and a *pro se* litigant to participate in the courtroom prayer through a demand that they return to the courtroom for the prayer practice. *Id.* ¶ 6. This additional harm was inevitable, as attorney Roe actively conducts business in Montgomery County and regularly appears before Judge Mack as part of that business. FAC ¶ 10. Since Judge Mack was sworn in on May 1, 2014, Defendants have violated attorney Roe's constitutional rights through their courtroom prayer practice "at least 20 times" during which attorney Roe appeared before Judge Mack "for at least 45 different matters." Supplemental Declaration of John Roe (Exhibit C) ¶ 2. Standing, through direct, personal exposure and through the risk of future harm to attorney Roe, should be evident.

Plaintiffs have also established actual and ongoing harm to attorney Jane Doe, who has altered her conduct in order to avoid the unconstitutional prayer practice. Defendants appear to acknowledge the legitimacy of this form of standing as a general matter, but cite *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) to note that the harm a plaintiff seeks to avoid must be "an injury in fact" and must be "certainly impending." Defendant Mack's Motion to Dismiss (Dkt. 24) at 8; *see also* Defendant Mack's Reply in Support of Mack's Motion to Dismiss (Dkt. 30) at 6 (clarifying Defendants' argument). The *Clapper* Court analyzed the specific facts before it and found that "the harm respondents seek to avoid is not certainly impending," 568 U.S. at 416, but was instead "highly speculative." 568 U.S. at 410 (describing the "highly attenuated chain of possibility" in plaintiffs' theory of standing).[2] In so ruling, the Court took great pains to contrast plaintiffs' inadequately alleged harm with harm found to confer standing in other cases. *See id.* at 419 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) (finding standing where plaintiffs "would suffer present harm by trying to combat the threat [of cross contamination, via pollen carried by bees, of genetically modified alfalfa crops to neighboring conventional alfalfa crops]"); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183–84 (2000) (holding that plaintiffs who curtailed their recreational activities on a river due to reasonable concerns about the effect of pollutant discharges into that river had standing); *Meese v. Keene*, 481 U.S. 465, 475 (1987) (stating that "the need to take . . . affirmative steps to avoid the risk of harm . . . constitutes a cognizable injury")); *see also id.* at 439 (Breyer, J., dissenting) (citing same). The most stark contrast was

---

[2] "[R]espondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts." *Id.*

with *Laidlaw*, where "[b]ecause the unlawful discharges of pollutants were 'concededly ongoing,' the only issue was whether 'nearby residents'—who were members of the organizational plaintiffs—*acted reasonably* in refraining from using the polluted area." *Clapper*, 568 U.S. at 419 (emphasis added).

As in *Laidlaw* and the other cases cited in *Clapper*, there is a chasm of difference between the "highly speculative" alleged harm in *Clapper* and the certainly impending harm Jane Doe seeks to avoid. As with the pollution in *Laidlaw*, Defendants' courtroom prayer practice is ongoing. *See* FAC ¶ 42; Supplemental Declaration of John Roe (Exhibit C) ¶¶ 6–7 (describing two encounters with the courtroom prayer practice in June of 2017). The affirmative steps taken by attorney Doe to avoid exposure to the prayer practice—declining new clients with cases in Judge Mack' court—are reasonable. Those affirmative steps have resulted in attorney Doe losing business. *See* Supplemental Declaration of Jane Doe (Exhibit D) ¶ 5. She has declined new clients both from the Attorneys on Demand network, *id.* ¶¶ 6–7, and from a direct family referral. *Id.* ¶ 8. This loss of business constitutes an injury in fact that is readily traceable to Defendants' policy of opening court sessions with clergy-led prayer. *Cf. Monsanto*, 561 U.S. at 155; *Laidlaw*, 528 U.S. at 181–83. Thus, attorney Doe has standing due to the actual, ongoing harm she is suffering.

Additionally, Defendant Montgomery County incorporates the argument made by TCOLE (presumably in Dkt. 15-5, not Dkt. 15-3) that FFRF lacks associational standing because "[t]he only connection FFRF has to Judge Mack's prayers are its one alleged member, Plaintiff Jane Noe" and that Ms. Noe's past injuries do not support a request for prospective injunctive relief. Proposed Memo in Support of TCOLE's Motion to Dismiss (Dkt. 15-5) at 8–9 (citing *Summers v. Earth Island Institute*, 555 U.S. 488 (2009)). This argument is obsolete after

Plaintiffs filed their First Amended Complaint in which all three individual plaintiffs are identified as members of FFRF. *See* FAC ¶¶ 9–11. Unlike Ms. Noe, plaintiffs John Roe and Jane Doe are suffering actual ongoing harm and likely future harm, making prospective injunctive relief proper. As both are members of FFRF, this satisfies the first element of the three-part test for associational standing, that the association's members independently meet the Article III standing requirements. *See, e.g.*, *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006). This is the only one of the three elements challenged by the County via TCOLE.

Defendant Mack's argument, also incorporated by Montgomery County, that FFRF lacks associational standing absent a showing that the individual plaintiffs were members of FFRF "before they observed the prayers" suffers a similar deficiency. *See* Defendant Mack's Motion to Dismiss (Dkt. 24) at 11 n.6 (citing only *Natural Arch & Bridge Soc'y v. Alston*, 209 F. Supp. 2d 1207, 1219 (D. Utah 2002)). The *Alston* court found that one individual plaintiff had standing due to a discrete past incident but that the association could not claim standing based on that discrete past incident, since the individual plaintiff was not a member at that time. *Alston*, 209 F. Supp. 2d at 1218 (finding that an "alleged incident that took place in the summer of 1998 satisfies Article III's requirement that [the individual plaintiff] suffer an injury-in-fact resulting from the challenged action" and that the individual plaintiff was not a member of the association in the summer of 1998). Even if this were a requirement to establish associational standing in the Fifth Circuit, the record in this case demonstrates that at least two of the individual plaintiffs are suffering actual ongoing harm, likely future harm, and have suffered past harm, all while being members of FFRF. FFRF's First Amended Complaint, which establishes the membership of each individual plaintiff, was filed on July 7. This Court can thus conclude that the harm suffered by John Roe in "mid-June" and "late June" occurred while he was a member of FFRF. *See*

Supplemental Declaration of John Roe (Exhibit C) ¶¶ 6–7. The likely future harm that will be suffered by Mr. Roe will take place while he's a member of FFRF and confers the necessary standing for both him and FFRF to seek prospective relief. Likewise, plaintiff Jane Doe is suffering ongoing harm from lost business, due to her desire to avoid the prayers in Judge Mack's court. Ms. Doe is currently an FFRF member and the harm is ongoing. Nothing more is needed to find that FFRF has associational standing in this case.

For these reasons, and the additional reasons argued in Plaintiff's Response to Defendant Mack's Motion to Dismiss (Dkt. 28) at 3–11, Plaintiffs have standing to challenge Defendants' clergy-led courtroom prayer practice.

## II.   Defendants fall far short of demonstrating beyond doubt that Plaintiffs are not entitled to relief on any set of facts.

Defendant Montgomery County incorporates by reference the second section of Defendant Mack's Motion to Dismiss (Dkt. 24) at 12–20 as well as the Proposed Memo in Support of TCOLE's Motion to Dismiss (Dkt. 15-5) at 10–14. In so doing, Montgomery County joins Defendant Mack in asking this Court to look beyond the pleadings to a handful of alleged examples of prayer in courtrooms and from that limited hearsay evidence conclude that Defendants' clergy-led courtroom prayer practice is supported by the same pedigree of "unambiguous and unbroken history of more than 200 years" that the Supreme Court found sufficient to justify legislative prayer in *Marsh v. Chambers*, 463 U.S. 783 (1983). Plaintiffs have already addressed the deficiencies of this argument and incorporate by reference their Response to Defendant Mack's Motion to Dismiss (Dkt. 28) at 12–18. Plaintiffs elaborate on those arguments below, so that the County and this Court will not join Defendant Mack in his confusion over the standard of review and Plaintiffs' limited burden at this stage of litigation.

In ruling on a motion to dismiss the Court must only decide whether the facts alleged in the complaint—accepted as true—plausibly show a violation of rights and a claim of relief. *Woodard*, 419 F.3d at 351 ("[T]he complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff."). Dismissal is appropriate "only if 'it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997)) (emphasis added). Instead, Defendants' essentially ask the Court to accept *their* factual assertions and legal conclusions as true and render a decision in their favor on the merits of Plaintiff's case. This is not appropriate at this stage, especially since both the facts and the applicable law are in dispute. Defendant Mack goes one step further afield in his reply, declaring that "Plaintiffs do not challenge the accuracy of the historical material cited [by Mack]" and "[b]y failing to brief it, Plaintiffs have effectively conceded that Judge Mack's practice satisfies the *Lemon* test." Defendant Mack's Reply in Support of Mack's Motion to Dismiss (Dkt. 30) at 7, 12. Defendant Mack is essentially inviting this Court to abandon the standard of review at the pleadings stage and require Plaintiffs to present their case in chief. This invitation should be declined.

Both Defendants acknowledge that Plaintiffs' First Amended Complaint invokes "the *Lemon* test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971)." Defendant Mack's Motion to Dismiss (Dkt. 24) at 22 (characterizing Plaintiffs as "rely[ing]" on *Lemon*). Plaintiffs have pled facts to support a finding that the courtroom prayer practice violates the *Lemon* test. They note that Defendant Mack "ran on a platform of reinstituting religious values" within the Justice of the Peace Precinct 1 office and that he publicly pledged that "as the Justice of the Peace I *will* bring the Prince of Peace to work with me every day." FAC ¶¶ 20, 22. These facts speak to the

religious purpose behind the courtroom prayer practice. Plaintiffs have also pled facts that speak to the religious effect of the prayer practice. To name only a few, Plaintiffs plead that the prayer practice amounts to "the government telling [citizens] when or how to pray," *id.* ¶9, that it "inflict[s] prayer," an exclusively religious exercise, on those attending court, *id.* ¶ 37, and that it "unambiguously and unnecessarily endorses religion." *Id.* ¶ 62. Plaintiffs also plead that the practice coerces participation in a religious exercise, *e.g. id.* ¶¶ 11, 34, 37, which violates the entirely separate coercion test. *See Lee v. Weisman*, 505 U.S. 577, 587 (1992) ("It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise") (collecting cases that invoke the coercion test). The Court should draw all reasonable inferences from Plaintiffs' pleadings and conclude that there is a set of facts under which this prayer practice violates the Establishment Clause.

III.   **Montgomery County is liable for the clergy-led prayer practice established within its Justice of the Peace Precinct 1 court.**

Plaintiffs bring claims against Defendant Montgomery County under § 1983 municipal liability. It is now well settled law that local governments are "persons" that "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978). But the extension of § 1983 liability to municipalities by the *Monell* court was no small thing. The Court reevaluated its prior restrictive interpretation of § 1983 liability in *Monroe v. Pape*, 365 U.S. 167 (1961), by looking to the legislative history of the Civil Rights Act of 1871 from which § 1983 was born. It noted that the very purpose of the act was in part to provide redress for the deprivation of civil rights caused by "the tacit complicity and deliberate inactivity of some Southern state and local officials [which]

insidiously fostered the [Ku Klux] Klan's vigilante terrorism." *Webster v. City of Houston*, 735 F.2d 838, 847–49 (5th Cir. 1984) (en banc) (providing a detailed historical background on § 1983 and the *Monell* decision). Accordingly, the failure of a municipality and its governing officials to take corrective action to protect the civil rights of their citizens constitutes "state action" for the purposes of § 1983 municipal liability. *See, e.g.*, *Jennings v. Patterson*, 488 F.2d 436, 441 (5th Cir. 1974) (finding a city liable for failing to remove a barricade erected by white landowners between a black landowner's property and a public street).

Under *Monell*, municipal liability attaches where plaintiffs have established three elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell* at 658). Plaintiffs have established each of these three elements, which are discussed in turn below.

### A. Plaintiffs have alleged facts sufficient to find an official courtroom prayer policy exists, by written policy and by persistent, widespread pattern or custom.

An "[o]fficial policy establishes culpability, and can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of Ft. Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 578). "Congress included customs and usages [in § 1983] because of persistent and widespread discriminatory practices of state officials." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). The question of whether a municipal custom exists is often a question of fact left to the determination of a jury. *See, e.g.*, *Adickes*, 398 U.S. at 173 (remanding for further proceedings after a directed verdict on question of whether a specific custom or usage existed); *Webster*, 735 F.2d at 842

("[T]his case must be retried under the standard now established both for allowing proof of and for determining the existence of municipal custom."). At the pre-discovery stage of litigation, all that is required of a plaintiff is to allege facts that, if true, would give rise to a claim of municipal liability. Plaintiffs have far exceeded that burden in this case. Plaintiffs have alleged facts that establish that an official policy existed through both a written policy statement and through a widespread practice or custom.

A "written policy statement"—as distinct from an ordinance or regulation—is sufficient to establish that an official policy exists. Plaintiffs have alleged that a written statement exists and that the written statement declares an official policy or practice. *See* FAC ¶ 56 ("Montgomery County's Justice of the Peace Precinct 1 building contains at least two signs outside the courtroom, and messages on two TVs in the courtroom, declaring that is the official policy or practice of the Precinct 1 court to include prayer at the start of court sessions."). Nothing more is needed to properly allege the first *Monell* element at the pleadings stage of litigation. This Court may, of course, take judicial notice of the actual wording on the courtroom signs, as a matter of public record. *See Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.") (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)). The actual language on the signs and TVs reads, in relevant part: "IT IS THE TRADITION OF THIS COURT TO HAVE A BRIEF OPENING CEREMONY THAT INCLUDES A BRIEF INVOCATION BY ONE OF OUR VOLUNTEER CHAPLAINS . . . ." *See* Supplemental Declaration of John Roe (Exhibit C) ¶ 8; and Exhibits C.1 and C.2 attached thereto. On their face, these written policy statements satisfy the *Monell* requirement that an official policy exist.[3]

---

[3] How the existing policy has been ratified or adopted by County policymakers is addressed in Section III.B., *infra*.

In addition, Plaintiffs have pleaded sufficient facts to find that an official policy exists through a persistent, widespread custom and usage. *Webster v. City of Houston*, the case that the Fifth Circuit later described as its "seminal decision on municipal section 1983 liability,"[4] argues for a broad application of that liability: "custom and usage in . . . § 1983 actually covered 'persistent and widespread' practices of ordinary sheriffs and prosecutors in failing to protect the rights of citizens. Custom and usage was not limited to the acts of policymaking officials." 735 F.2d at 850. The Fifth Circuit reaches this conclusion by returning to "the original setting and purpose of the statute," which was passed at a time when "some local law enforcement officials were systematically refusing to enforce state criminal laws against members of the Ku Klux Klan and similar groups. State law did not sanction or permit such discrimination, and in some cases the highest state officials opposed that discrimination. But individual state employees who actually carried out the administration of the criminal law pursued the non-enforcement practices nonetheless." *Id.* To be sure, municipal liability does not extend to *respondeat superior* liability (liability solely for employing wrongdoers). *Id.* at 848. But when policymaking officials turn a blind eye to a practice so "common and well-settled as to constitute a custom that fairly represents municipal policy," municipal liability attaches. *Peterson*, 588 F.3d at 847; *Piotrowski*, 237 F.3d at 579; *Webster*, 735 F.2d at 841.

At this stage of the case, the burden on Plaintiffs to demonstrate a pattern or practice is extremely minimal. *See, e.g.*, *Harvey v. Montgomery County*, 881 F. Supp. 2d 785, 797–98 (S.D. Tex. 2012) (denying County's motion to dismiss a municipal liability claim when presented with "several specific incidents involving excessive use of force" and "claims that there have been 200 complaints of excessive use of force and 200 complaints of unlawful detention . . . in the last ten years" though the merit of those additional complaints had not yet been determined); *Barr v.*

---

[4] *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).

*City of San Antonio*, No. 06-CV-261, 2006 WL 2322861 at *4 (W.D. Tex. 2006) (finding a pattern was alleged by asserting, without citation, "that the City has been named as a defendant in four similar lawsuits" and denying city's motion to dismiss because "[a]t the motion to dismiss stage . . . it is not appropriate to dismiss a case for failure to state a claim when evidence might be adduced showing that the City has constructively adopted such a policy or custom as Plaintiff alleges"); *Starstead v. City of Superior*, 533 F. Supp. 1365, 1369–70 (W.D. Wis. 1982) (finding sufficient allegation of a pattern by describing systematic misuse of police dogs and citing five incidents involving seven people). Plaintiffs have met this minimal burden by describing several specific incidents of the courtroom prayer practice experienced by each of the three individual plaintiffs and alleging that the prayer practice occurs at each Justice of the Peace Precinct 1 court session. *See* FAC ¶¶ 25, 43, 46. Montgomery County does not appear to dispute that the courtroom prayer practice occurs consistently and regularly. Instead, Defendant argues that a practice must be ubiquitous or at least pervasive throughout the county in order to constitute a pattern or custom. The case law does not support the County's interpretation.

Defendant asserts, without providing citation, that a practice "of one (1) of five (5) justices of the peace cannot be said to be common or widespread such that it fairly represents Montgomery County policy." MTD at 22. This is incorrect. A custom or practice "with the force of law in a political subdivision" can be imputed on the overseeing government entity without a showing that the custom existed *throughout* that government entity. *Adickes*, 98 U.S. at 173 (holding that petitioner need not show the relevant custom of segregating the races in public restaurants existed throughout the State of New York in order to establish § 1983 liability; rather, "proof that it had the force of law in Hattiesburg—a political subdivision of the State" would be sufficient). While misconduct that is "isolated" in terms of *frequency* may not give rise to

municipal liability, the same cannot be said for misconduct that is frequent but "isolated" in terms of *geography*.

Defendant should know that municipal liable under § 1983 can attach to conduct taking place within only one of its precincts. Less than three years ago, the U.S. District Court for the Southern District of Texas denied Defendant's motion to dismiss—and in 2015 denied its motion for summary judgment—in a case alleging municipal liability for conduct occurring solely within the Montgomery County Precinct 4 Constable's Office. *See Carr v. Montgomery County*, 59 F. Supp. 3d 787 (S.D. Tex. 2014) (denying County's motion to dismiss); *Carr v. Montgomery County*, No. H-13-2785, 2015 WL 5307673 (S.D. Tex. Sept. 10, 2015) (denying County's motion for summary judgment). The court found the plaintiff had pled "sufficient facts to state a claim of a persistent practice of Montgomery County Constable's Office officers" where that single constable's office had allowed camera crews to accompany officers during raids on four occasions. *Carr*, 59 F. Supp. 3d at 801–02. That persistent practice could be imputed on Montgomery County, though in subsequent stages of litigation, "an estimate of the number of times this conduct has occurred throughout the precinct, or facts regarding the size of the precinct or county . . ." would be relevant considerations. *Id.* at 802 (citing *Harvey v. Montgomery County*, 881 F. Supp. 2d at 798 (allowing a municipal liability claim to proceed based on well-plead facts, but explaining that the actual merits of plaintiff's claims, and context such as department size and the amount of crime in the county, would be relevant considerations at the motion for summary judgment stage)). In this case, the courtroom prayer practice is persistent and widespread in that it occurs at every Justice of the Peace Precinct 1 court session. This pattern of conduct follows from an explicit written policy statement. Whether through that

statement alone or through the resulting persistent pattern or custom, Plaintiffs have sufficiently alleged that the courtroom prayers constitute a "policy."

    **B.** **Plaintiffs have alleged facts sufficient to find that the County had actual and constructive knowledge of the official courtroom prayer practice and alternatively that Judge Mack exercised policymaking authority in implementing the courtroom prayer practice.**

    "Reviewing the relevant legal materials, including state and local positive law, as well as ' "custom or usage" having the force of law,' the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor . . . ." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 n.1 (1988)). The Court must determine who is the final policymaker, through reference to relevant law and also through review of "custom or usage having the force of law," which is a distinct inquiry and a necessary safeguard. If a county's lawful policymakers "could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." *Praprotnik*, 485 U.S. at 126. Thus, "[t]he purpose of the custom or usage exception is to cover the actions of non-policymaking government employees whose actions are tolerated by the policymakers." *Webster*, 735 F.2d at 850 n.32. Whether or not an official policymaker is directly responsible for the conduct, "attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by a separate doctrine. Relying on the language of § 1983, the Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Praprotnik*, 485 U.S. at 126. "That principle, which has not been affected by *Monell* or

subsequent cases, ensures that most deliberate municipal evasions of the Constitution will be sharply limited." *Id.*

Even under the separate but related "custom or usage" doctrine, actual or constructive knowledge "must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Piotrowski*, 237 F.3d at 579 (quoting *Webster*, 735 F.2d at 842). As discussed above, Plaintiffs have adequately alleged a persistent custom with the force of law: the clergy-led prayer practice that opens each session in Judge Mack's courtroom. *See* section III.A., *supra*. Additionally, Plaintiffs have adequately alleged actual or at least constructive knowledge of the courtroom prayer practice, attributable to Defendant Montgomery County.

Several facts alleged within Plaintiffs' complaint warrant a finding of constructive knowledge. First, "[c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities . . . ." *Webster*, 735 F.2d at 842 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)). In this case, constructive knowledge can be inferred from the conspicuously posted signs and TV messages within the Justice of the Peace Precinct 1 building. *See* FAC ¶ 56. It seems unlikely that an agent with policymaking authority over the Precinct 1 court could "properly exercise[] its responsibilities" without learning of these signs or the regularly held courtroom prayers to which they refer.

Second, a municipality has constructive knowledge, and is thus liable, for a custom that has "occurred *for so long or so frequently* that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [municipal] employees." *Webster*, 735 F.2d at 842 (emphasis added). In this case, the

sheer duration of the prayer practice, which began "[s]hortly after Judge Mack assumed the office of Justice of the Peace on May 1, 2014," FAC ¶ 25, lends itself to the conclusion that Montgomery County's policymaking officials have learned of the practice by now. The practice has continued to occur, regularly, for over three years. *See* Supplemental Declaration of John Roe (Exhibit C) ¶¶ 6–7 (describing two encounters with the prayer practice in June of 2017).

Third, a court may attribute constructive knowledge to a municipality "where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Webster*, 735 F.2d at 842 (citing *Bennett*, 728 F.2d at 768). As to the prayer practice, Plaintiffs alleged a high degree of publicity and prolonged public discussion. *See* FAC ¶¶ 22–24, 38–41 (describing FFRF's complaint to the Texas State Commission on Judicial Conduct, Judge Mack's subsequent open letter to "Pastors & People of Faith" calling FFRF's letter a "national and local attack from those that believe that God & Faith has no place in public lives and service," and Judge Mack's three resulting annual Prayer Breakfasts); *see also* First Declaration of Jane Doe (Dkt. 2-2) ¶¶ 6–7 (describing Judge Mack's comments about FFRF's letter at his first annual prayer breakfast and statement that "nearly every Montgomery County government official attended this event."); First Declaration of John Roe (Dkt. 2-4) ¶ 5 (describing the "countless" public responses on social media after FFRF's complaint to the State Commission). While more could be offered at the summary judgment phase—such as examples of the pervasive media coverage of the prayer practice prior to the filing of this lawsuit or evidence of the highly publicized involvement of Attorney General Ken Paxton and Lieutenant Governor Dan Patrick during the State Commission on Judicial Conduct investigation—the facts alleged in the complaint are more than sufficient to establish constructive knowledge on the County's part.

Additionally, Plaintiffs' complaint and the publicly available documents of which this Court may take judicial notice establish that Montgomery County's final policymakers had *actual* knowledge of the prayer practice. First, the publicly available document listing the "Courtroom Rules" for Judge Mack's court includes a statement similar to those found within the courtroom itself: "IT IS THE TRADITION OF THIS COURT TO HAVE A BRIEF OPENING CEREMONY THAT INCLUDES A BRIEF INVOCATION BY ONE OF OUR VOLUNTEER CHAPLAINS . . . ." *See* Judge Wayne L. Mack Courtroom Rules (Exhibit A). This "Courtroom Rules" document appears on the County's official website, mctx.org, and bears the official Montgomery County seal. *Id.* (available at www.mctx.org/document_center/1Justices/ Courtroom%20Rules.pdf).

Second, the highlight reel referred to in the complaint, FAC ¶ 22, includes interviews at Judge Mack's first annual Prayer Breakfast with County Judge Craig Doyal, County Sheriff Tommy Gage, and County Commissioner Charlie Riley, among others. *See* First Annual Prayer Breakfast Highlight Reel (Exhibit B)[5] at 00:10, 00:07, and 00:55, respectively. These three men are all final policymakers within their areas of County government. *See Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) ("There are, to be sure, many actions of a county judge that may justifiably be considered to constitute or represent county 'policy' under *Monell*."); *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) (noting that "in Texas, the county sheriff is the county's final policymaker in the area of law enforcement"); *Bennett v. City of Slidell*, 728 F.2d at 767 ("Usually a council or commission will be the governing body to which responsibility must be attached."). The Montgomery County Commissioners Court—of which County Judge Doyal and Commissioner Riley are two of the five members—is the final policymaking authority with respect to the Justice of the Peace Precinct 1 court, unless that

---

[5] As of August 17, 2017, this exhibit is also available at www.youtube.com/watch?v=8SSGFg6ik4E.

policymaking authority has been delegated to Judge Mack himself. In either case, the County remains ultimately liable for the prayer practice.

Lastly, in the alternative, the allegations in the complaint support a finding that in this specific instance, the Montgomery County Commissioners Court has vested policymaking authority in Judge Mack himself, such that he qualifies as the final policymaker from whom municipal liability extends. "[C]ulpable policy is attributable to the governing body of the city where the policy was made by an official to whom the governing body ha[s] given policymaking authority." *City of Slidell*, 728 F.2d at 769. "Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance. The governing body retains the prerogative of the purse and final legal control by which it may limit or revoke the authority of the official." *Id.* Judge Mack's responsibilities within the Justice of the Peace Precinct 1 support a finding that he has been granted such policymaking authority. Plaintiffs allege that Judge Mack has "final policymaking authority" within the Precinct 1 court, FAC ¶ 13, support this contention by describing his exercise of that authority, which is attributed to both Judge Mack and Montgomery County. FAC ¶ 25 ("Defendants implemented the practice of opening each Justice of the Peace Precinct 1 court session with a prayer delivered by a guest chaplain"); FAC ¶ 42 ("By spring 2015, Defendants had revised their courtroom prayer practice.").

While Defendant Mack points to several cases in which final policymaking authority has not been extended from a county to a justice of the peace, *see* Reply Brief in Support of Judge Mack's Motion to Dismiss (Dkt. 30) at 13, the two cited decisions with precedential value for this Court explicitly involved justices of the peace acting in their judicial capacities, rather than in a policymaking role. *See, e.g.*, *Krueger v. Reimer*, 66 F.3d 75, 77 (5th Cir. 1995) ("A local

judge *acting in his or her judicial capacity* is not considered a local government official whose actions are attributable to the county.") (emphasis added); *Bigford v. Taylor*, 834 F.2d 1213, 1222 (5th Cir. 1988) ("Judge Buckner was charged with carrying out Texas's policy that vehicles be delivered, after a hearing, to the rightful owner."). In fact, the *Krueger* court cited *Johnson v. Moore*, for the proposition that acts made in a judicial capacity are not attributable to the county, which in turn cites *Familias Unidas* and notes that the case "distinguish[es] [a] judge's administrative duties, actions pursuant to which may constitute county policy under *Monell*, from [a] judge's judicial function, in which he or she effectuates state policy by applying state law." 958 F.2d 92, 94 (5th Cir. 1992) (citing 619 F.2d at 404). When compared to *Johnson* and *Familias Unidas*, the unreported decision in *Tinoco v. Raleeh*, the third case cited by Defendant Mack, clearly overstates the law and should not be followed. 2006 WL 27287 (E.D. Tex. 2006) ("[T]he job of a Texas Justice of the Peace does not involve policymaking functions . . . .").

Defendant Montgomery County claims that Judge Mack cannot have final policymaking authority because his power is limited to the Justice of the Peace Precinct 1 and "[t]he power to make and enforce policy *for the entire county* is the determining factor in deciding an elected official's capacity to be a 'final policymaker' for section 1983 municipal liability." MTD at 15 (emphasis added). Defendant cites *Rhode v. Denson*, 776 F.2d 107 (5th Cir. 1985), but that case does not support Defendant's contention. The *Rhode* court explicitly noted that "while Denson was constable for county precinct number four, not the entire County, he could serve process and make arrests and otherwise carry out the duties of a peace officer *throughout the County*." *Rhode*, 776 F.2d at 109 (emphasis added). The court then concluded that the "determining factor" was not that "a constable is elected by voters from a subunit of the County" but rather that the constable "was not given that discretion, or range of choice, that is at the core of the

power to impose one's own chosen policy." *Id.* In other words, the constable's "narrowly circumscribed duties"—"which include making arrests and serving warrants and process"—did not include policymaking powers. *Id.* In contrast, Plaintiffs allege that Defendant Mack has been vested with policymaking powers within the Justice of the Peace Precinct 1 court. Defendant Mack has literally established a policy within the court. The fact that his court is a "subunit of the County" is immaterial. The County does not appear to dispute that the prayer practice actually takes place. And if the prayer practice exists, Defendant would be hard-pressed to explain how it came to exist, and how it has continued to exist for over three years, without the exercise of policymaking authority.

### C. The courtroom prayer practice is a moving force behind the deprivation of Plaintiffs' constitutional rights.

Plaintiffs must allege that the prayer practice was a "moving force" behind their deprivation of constitutional rights. *Piotrowski*, 237 F.3d at 578 (citing *Monell* at 658). This requirement has alternatively been called the "causal link/moving force" requirement. *See Grandstaff v. City of Borger*, 767 F.2d 161, 169–71 (5th Cir. 1985), *cert. denied*, 480 U.S. 916 (1987) (finding a causal link/moving force between a city's decision "to operate a police force where prevalent recklessness endangered human life and safety" and plaintiff's death). A finding of proximate cause is sufficient to meet the moving force requirement. *Id.*

Defendant does not truly call into question whether the prayer practice was a moving force behind the Plaintiffs being subjected to prayer in the Justice of the Peace Precinct 1 courtroom. Defendant merely reiterates its contention that Plaintiffs did not establish the other two *Monell* factors. MTD at 22–23 ("The Complaint fails to properly allege either a final policymaker or official policy of Montgomery County . . . ."). Those assertions have been addressed in Sections III.A. and III.B., *supra*. In this case, Plaintiffs allege not only that the

courtroom prayer practice is a proximate cause of their injuries, but is, in fact, the *actual* cause of those injuries. *See* FAC ¶ 61 ("Through their courtroom prayer practice, Defendants have violated the rights of each individual plaintiff to be free from religious endorsement by the government."). All the injuries described by the individual plaintiffs, *see* Response in Opposition to Mack's Motion to Dismiss (Dkt. 28) at 4–9, are directly attributable to the courtroom prayer practice. Nothing more is needed to sustain Plaintiffs' claim of § 1983 municipal liability.

## CONCLUSION

Judge Mack and Montgomery County have instituted a novel courtroom prayer practice within the County's Justice of the Peace Precinct 1. Each individual plaintiff has experienced direct, personal contact with the prayer practice and two of the plaintiffs are suffering ongoing harm and the exceedingly likely risk of future harm. The Defendants have not established anything approaching an unambiguous and unbroken history of more than 200 years that would justify their courtroom prayer practice and Plaintiffs have pled facts demonstrating that this practice violates the Establishment Clause. The pleadings suggest at the very least that the practice was adopted for a religious purpose, that it has the effect of endorsing an exclusively religious exercise, and that it coerces participation from litigants, attorneys, and other citizens attending court. Finally, Montgomery County had actual and constructive knowledge of this prayer policy. The County is ultimately responsible for adopting the policy and it failed to take corrective action to protect the civil rights of its citizens. The County may not now, after three years of regularly scheduled courtroom prayers, insulate itself from liability by claiming that it had no role in this practice.

For the foregoing reasons, the Court should deny Defendant Montgomery County's Motion to Dismiss.

DATE: August 18, 2017

Respectfully submitted,

*/s/ Sam Grover*
Patrick A. Luff
Attorney-in-charge
Texas State Bar No. 24092728
S.D. Tex. Bar No. 2896159
LUFF LAW FIRM, PLLC
3123 NW Loop 410
San Antonio, TX 78230
Telephone:     210-504-7575
Telecopier:     830-584-0628
Email:  luff@lufflaw.com

Sam Grover
Wisconsin State Bar No. 1096047
Elizabeth Cavell
Wisconsin State Bar No. 1089353
(*pro hac vice*)
FREEDOM FROM RELIGION FOUND., INC.
P. O. Box 750
Madison, WI 53701
Telephone:  608-256-8900
Telecopier:  608-204-0422
Email:  sgrover@ffrf.org / ecavell@ffrf.org

## CERTIFICATE OF SERVICE

I, Sam Grover, hereby certify that on this the 18th day of August, 2017, a true and correct copy of the foregoing document was transmitted using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record. A separate copy of Exhibit B was mailed to the Court on this same day and counsel for Defendants have agreed to alternative service of Exhibit B, which was also delivered today.

*/s/ Sam Grover*
Sam Grover