United States District Court
Southern District of Texas

**ENTERED**

January 19, 2018

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., JANE DOE, JOHN ROE, and JANE NOE,<br><br>    Plaintiffs,<br><br>v.<br><br>JUDGE WAYNE MACK and MONTGOMERY COUNTY, TEXAS,<br><br>    Defendants. | § § § § § § § § § § § § § | CIVIL ACTION NO. H-17-881 |

MEMORANDUM AND ORDER

Pending is Defendant Montgomery County's Motion to Dismiss Pursuant to Rule 12(b)(1) and Rule 12(b)(6) (Document No. 29).[1] After carefully considering the motion, response, reply, the parties' oral arguments at the motion hearing, and applicable law, the Court concludes as follows.

---

[1] Defendant Judge Wayne Mack's Motion to Dismiss (Document No. 24), which was filed by counsel representing Judge Mack only in his individual capacity, is DISMISSED as moot in light of Plaintiffs' written clarification and confirmation on the record that they bring their claim against Judge Mack only in his official capacity and not in his individual capacity. The State of Texas's opposed Motion for Leave to File Brief as Amicus Curiae in Support of Defendants (Document No. 44), in which the Texas Commission on Law Enforcement joins, is DENIED because it is largely duplicative of arguments made in other briefs, and is therefore not particularly useful, it argues facts, it strongly favors one side over the other, and, as well, the County has representation by able counsel. Cf. Club v. Fed. Emergency Mgmt. Agency, No. CIV.A. H-07-0608, 2007 WL 3472851, at *1 (S.D. Tex. Nov. 14, 2007) (Rosenthal, J.) (denying motion for leave to file amicus curiae brief and stating similar concerns).

## I. Background

This suit challenges the courtroom prayer practice of Defendant Judge Wayne Mack ("Judge Mack") under the Establishment Clause of the First Amendment, and alleges the following facts, which the Court accepts as true in analyzing the Rule 12(b)(6) motion.  In May 2014, Judge Mack was sworn in as a Justice of the Peace of Defendant Montgomery County, Texas (the "County"), after running on a platform of reinstituting religious values within the office.[2]  Shortly after assuming office, Judge Mack established a chaplaincy program and began a practice of opening each court session with a prayer delivered by a guest chaplain.[3]

In August 2014, Plaintiff Jane Noe ("Noe") appeared before Judge Mack on official business.[4]  Judge Mack entered the courtroom and announced that everyone should remain standing for prayer, but stated, "If any of you are offended by that you can leave into the hallway and your case will not be affected."[5]  Judge Mack spent a few minutes describing the chaplaincy program and introducing the day's "visiting pastor."[6]  The guest chaplain then stood and read

---

[2] Document No. 22 ¶¶ 20-21 (1st Am. Compl.).

[3] Id. ¶¶ 21, 25.

[4] Id. ¶ 26.

[5] Id. ¶¶ 27-28.

[6] Id. ¶¶ 29-30.

from the Bible to those present in the courtroom for five to eight minutes.[7]  Judge Mack "appeared to study how those in attendance reacted to the sermon."[8]  When the guest chaplain asked everyone to bow their heads for prayer, Judge Mack did not bow his head and instead observed those in the courtroom.[9]  Noe is an atheist and alleges that being subjected to religious prayer by a government official violates her sincerely held beliefs, but she "did not leave after the invitation to do so out of fear that her actions would prejudice Judge Mack against her."[10]

The next month, Plaintiff Jane Doe ("Doe") appeared as an attorney in Judge Mack's courtroom and observed a similar prayer practice; only the content of the prayer and the identity of the chaplain differed.[11]  Doe is a Christian who objects, based on her sincerely held beliefs, to the government telling her when or how to pray.[12]  Doe works in Montgomery County and has appeared before Judge Mack four times since he instituted his prayer practice.[13]  Doe has always remained in the courtroom during the prayers because

---

[7] Id. ¶ 31.

[8] Id. ¶ 32.

[9] Id. ¶ 33.

[10] Id. ¶¶ 11, 34.

[11] Id. ¶ 36.

[12] Id. ¶ 9.

[13] Id.

she believes that leaving would bias Judge Mack against Doe and her clients, but she now tries to avoid appearing before Judge Mack.[14]

Plaintiff John Roe ("Roe") is an attorney who regularly appears before Judge Mack and objects to being subjected to religious prayers, but fears that leaving the courtroom during the prayers would bias Judge Mack against him and his clients.[15] Noe, Doe, and Roe are members of Plaintiff Freedom From Religion Foundation, Inc. ("FFRF"), a non-profit organization that advocates for the separation of church and state.[16] In September 2014, FFRF sent Judge Mack a letter requesting that he cease the prayer practice and asserting that the prayers created an appearance of bias and violated the Establishment Clause.[17] Judge Mack did not respond to FFRF's letter, but mentioned it in an open letter to "Pastors & People of Faith" in which he wrote that "I want to make a statement to show those that feel what we are doing is unacceptable . . . that God has a place in all aspects of our lives and public service."[18]

FFRF filed a complaint with the Texas State Commission on Judicial Conduct, which ultimately declined to discipline Judge

---

[14] Id.

[15] Id. ¶ 10.

[16] Id. ¶¶ 8-11.

[17] Id. ¶ 38; Document No. 22-1 at 4-5.

[18] Document No. 22 ¶¶ 38-39; Document No. 22-1 at 6.

4

Mack, citing its lack of authority to determine whether the prayer practice was unconstitutional, but strongly cautioned Judge Mack to end his prayer practice or substitute a "perfunctory acknowledgment of religion that is accepted and employed by the United States Supreme Court and the Texas Supreme Court."[19]

In the meantime, Judge Mack revised his prayer practice in the spring of 2015, and it has remained largely consistent since then.[20] At the start of each court session, after the docket has been called but before Judge Mack enters, the bailiff gives an introduction describing the prayer practice, which sometimes includes a notice that those opposed to prayer may leave the courtroom without affecting the outcome of their cases.[21] Judge Mack then enters, talks about the chaplaincy program, and introduces the chaplain.[22] The chaplain then leads a prayer, sometimes preceded by a short sermon, both directed to those in attendance, and "everyone present is asked to participate, or show

---

[19] Document No. 22 ¶¶ 40-41; Document No. 22-1.

[20] Document No. 22 ¶ 42.

[21] Id. ¶¶ 46-47.

[22] Id. ¶ 48. Judge Mack selects an available chaplain for each court session from a database of religious leaders who participate in the program. Id. ¶ 43. The County reviews applications for the chaplaincy program and administers the training required to become an eligible chaplain. Id. ¶ 45. This chaplaincy program "was allegedly started to assist Judge Mack with his duties as coroner for the County, a concomitant position in which he serves as Justice of the Peace." Id. ¶ 44.

obeisance, by bowing their heads."[23]   During this time, the courtroom doors remain magnetically locked, and anyone who seeks reentry after exiting during the prayers must draw attention to himself by knocking.[24]   Judge Mack is the only Justice of the Peace in Montgomery County or any surrounding county who locks his courtroom doors, and he began doing so at approximately the same time that he revised his courtroom prayer practice.[25]   Because the docket is called before the prayers, Judge Mack can monitor who has left during the prayers.[26]

All of the prayers in Judge Mack's courtroom witnessed by Plaintiffs have been sectarian, delivered by Christians, in the name of Jesus.[27]   The County's Justice of the Peace Precinct 1 building contains two signs outside the courtroom and messages on two screens in the courtroom declaring that it is the official policy or practice of the Precinct 1 court to include prayer at the start of court sessions.[28]

Plaintiffs allege that Judge Mack's courtroom prayer practice unconstitutionally endorses and advances religion--specifically,

---

[23] Id. ¶ 49.

[24] Id. ¶ 53.

[25] Id. ¶ 54.

[26] Id. ¶ 55.

[27] Id. ¶ 60.

[28] Id. ¶ 56.

Christianity--and coerces participation in the prayer practice in violation of the Establishment Clause.[29]   Plaintiffs seek declaratory and injunctive relief, nominal damages, and an award of attorneys' fees and costs.[30]   Plaintiffs have clarified--and confirmed at oral argument--that they sue Judge Mack "only in his official capacity as the presiding officer over Montgomery County's Justice of the Peace Precinct 1, not in his individual, personal capacity."[31]   Thus, despite the pleading's reference to "Defendants," Plaintiffs' claims against Judge Mack, which are limited to his official capacity, are merely another way of stating their claims against the County.[32]   *See* <u>Kentucky v. Graham</u>, 105 S. Ct. 3099, 3105 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); <u>Tinoco v. Raleeh</u>, No. 4:05CV367, 2006 WL 27287, at *2 (E.D. Tex. Jan. 5, 2006) ("[T]he Court will consider Plaintiff's discrimination claim as though properly brought against [a Justice of the Peace] in his official capacity, and therefore, as though properly brought against Collin County."). The County moves to

---

[29] <u>Id.</u> ¶¶ 61-68.

[30] <u>Id.</u> at 11-12.

[31] Document No. 41.

[32] Counsel for the County confirmed at oral argument that it represents the County and Judge Mack in his official capacity.

dismiss, challenging Plaintiffs' standing under Rule 12(b)(1) and arguing that Plaintiffs have failed to state a claim under Rule 12(b)(6).[33]

## II. The County's Objections

The County objects to the exhibits attached to Plaintiffs' response brief, particularly the declarations of Roe and Doe, arguing that the factual assertions contained therein may not be considered in ruling on the County's motion to dismiss.[34]  "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto."  Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000).  However, in determining whether the Court has subject matter jurisdiction, the Court is not confined to the pleadings.  Ambraco, Inc. v. Bossclip B.V., 570 F.3d 233, 238 (5th Cir. 2009) (under Rule 12(b)(1), the court is permitted to look at evidence in the record beyond facts alleged in the complaint).  Accordingly, the Court does not consider Plaintiff's exhibits in determining whether Plaintiff has stated a claim but may consider them in determining whether Plaintiffs have standing in connection with the County's Rule 12(b)(1) motion.

---

[33] Document No. 29.

[34] Document No. 35 at 1-2.

## III.   Motion to Dismiss for Lack of Standing

### A.   Legal Standard

Under Rule 12(b)(1), a party can seek dismissal of an action for lack of subject matter jurisdiction.  FED. R. CIV. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  Home Builders Ass'n of Miss., Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted).  "Because standing is an element of the constitutional requirement of 'case or controversy,' lack of standing deprives the court of subject matter jurisdiction."  In re Weaver, 632 F.2d 461, 462 n.6 (5th Cir. 1980).  "Lack of subject matter jurisdiction may be found in any one of three instances:  (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001).  The burden of establishing subject matter jurisdiction is on the party seeking to invoke it.  Id.

### B.   Discussion

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and

9

'controversies.'" Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 102 S. Ct. 752, 757 (1982). "The power to declare the rights of individuals and to measure the authority of governments . . . 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy.'" Id. at 758 (quoting Chicago & Grand Trunk R. Co. v. Wellman, 12 S. Ct. 400, 402 (1892)). Accordingly, the Court "has always required that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." Id. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 120 S. Ct. 693, 704 (2000).

Plaintiffs have established the second and third requirements of standing: their alleged injury if cognizable arises from Judge Mack's challenged prayer practice and would be redressed by a decision holding the prayer practice to be unconstitutional. The County argues, however, that Plaintiffs lack Article III standing because (1) they have not alleged a cognizable injury in fact and (2) they have not plausibly alleged with reasonable certainty any

future appearances before Judge Mack, so as to establish that any injury is imminent.[35]

1.    Injury in Fact

"[T]he concept of injury for standing purposes is particularly elusive in Establishment Clause cases."   Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 294 n.31 (5th Cir. 2001) (quoting Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir. 1991)).   The County argues that this case is controlled by the Supreme Court's 1982 decision in Valley Forge, in which the Court held that plaintiffs who learned from the news about the conveyance of a tract of government property in another state to a Christian college lacked standing to sue under the Establishment Clause.   102 S. Ct. 752.   The Court explained:

> Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of *conduct with which one disagrees.* That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms. It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.

---

[35] Document No. 29 at 11-12 (incorporating Document No. 24 at 5-11).

Id. at 765-66.  The County argues that Plaintiffs' only injury is the "psychological consequence" of observing what they perceive as an Establishment Clause violation, which is insufficient to confer standing under Valley Forge.

After Valley Forge, the Fifth Circuit has twice en banc considered standing in Establishment Clause challenges and both times rejected the County's broad reading of the Supreme Court's language.  In Doe v. Beaumont Independent School District ("BISD"), the en banc court addressed the constitutionality of a school district's program that invited volunteer clergy to counsel groups of students regarding secular topics.  240 F.3d 462 (2001) (en banc).  In a highly fractured decision, the Fifth Circuit held that the plaintiff students and parents had standing to bring suit, but remanded to resolve fact issues on the merits.  Id.  Six dissenting judges asserted that under Valley Forge, the plaintiffs lacked standing because they had "failed even to allege--much less offer any proof of--any injury suffered as a result of attending schools that participate in the Clergy in Schools Program."  Id. at 479 (Jolly, J., dissenting).  Judge Higginbotham's controlling opinion for the court rejected this view, explaining that the Valley Forge plaintiffs "learned of the federal government's conveyance of property to a religious institution in another state.  Those plaintiffs had *no* relationship to the government action at issue other than an interest in seeing the law enforced."  Id. at 466.

12

Judge Higginbotham noted that "[p]laintiffs have standing to assert . . . that their use or enjoyment of a public facility is impaired by an alleged violation of the Establishment Clause." Id. (citations omitted). Six judges separately concurred that the plaintiffs had standing and rejected a broad reading of Valley Forge. Id. at 498-99 (Weiner, J., concurring in part and dissenting in part) ("The Does are in no way comparable to the Valley Forge plaintiffs, who had only the most abstract and geographically remote of interests in bringing their challenge. The Does do not merely disagree in a general, intellectual sense with the School District's actions; rather, they object to their children's being forced personally to run the risk every day of being subjected to a religion-endorsing program that operates in their very own schools.").

Six years after BISD, the Fifth Circuit en banc considered an Establishment Clause challenge to a school board's practice of opening its meetings with prayer. Doe v. Tangipahoa Par. Sch. Bd. ("Tangipahoa Parish"), 494 F.3d 494 (5th Cir. 2007) (en banc). The court held that there was no standing because the plaintiffs had omitted from the stipulated record any evidence that they had personally been exposed to the prayers. Id. at 497. As the majority framed the issue,

> Standing to challenge invocations as violating the Establishment Clause has not previously been based solely on injury arising from mere abstract knowledge that

13

invocations were said.  The question is whether there is proof in the record that Doe or his sons were exposed to, and may thus claim to have been injured by, invocations given at any Tangipahoa Parish School Board meeting.

Id.  The dissenting judges disagreed with the majority's reading of the record but agreed that personal exposure to the prayer was sufficient to establish standing.  Id. at 512 (Barksdale, J., dissenting) ("The record bears out that the Does attended School Board meetings at which prayers were offered.  That exposure gave them standing to bring this suit then, and it gives them standing to maintain it now.").

Thus, under BISD and Tangipahoa Parish, personal exposure to an alleged Establishment Clause violation that impairs a plaintiff's enjoyment or use of a public facility is sufficient to confer standing to challenge the violation.  BISD, 240 F.3d at 466; see also Doe v. Sch. Bd. of Ouachita Par., 274 F.3d 289, 292 (5th Cir. 2001) ("This court held earlier this year that plaintiffs have standing to assert that their use or enjoyment of a public facility is impaired by an alleged violation of the Establishment Clause.") (citing BISD, 240 F.3d at 466); Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 294 n.31 (5th Cir. 2001) ("[S]tanding to assert an Establishment Clause claim may rest . . . on the plaintiff's direct exposure to the challenged activity.") (citation omitted); Murray v. City of Austin, 947 F.2d 147, 151-52 (5th Cir. 1991) (resident who received correspondence from the city, used its

public services, and visited municipal buildings had standing to challenge inclusion of cross in city's seal).  Because all three individual Plaintiffs, while present on judicial business in Judge Mack's courtroom, have been exposed to the opening prayers delivered as part of his prayer practice to which they object, Plaintiffs have alleged an injury in fact adequate to confer standing to challenge the prayer practice.

2.   Imminence of Further Injury

To satisfy the imminence requirement for Article III standing, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of possible future injury" are not sufficient.'"  Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013) (citations omitted).  The County argues that Plaintiffs lack standing to seek prospective injunctive and declaratory relief because they have not alleged that they are certain to appear before Judge Mack again so as to establish that any injury is "certainly impending."[36]

As the Supreme Court clarified in Clapper, its cases "do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about.  In some instances, we have found standing based on a 'substantial risk'

---

[36] Document No. 24 at 9-11.

that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." Id. at 1150 n.5.

Plaintiff Roe alleges that he "regularly represents clients before Judge Mack."[37] Roe also testifies in his declaration that he has appeared before Judge Mack at least twenty times, for at least forty-five different matters; that since the filing of Plaintiffs' First Amended Complaint, he has appeared before Judge Mack at least three times, representing at least ten clients; and that he has been exposed to Judge Mack's prayer practice every time he has appeared before Judge Mack.[38] Under these circumstances, Roe has adequately established that further exposure to Judge Mack's prayer practice is "certainly impending" and Roe therefore has standing to pursue prospective injunctive and declaratory relief.[39]

---

[37] Document No. 22 ¶ 10.

[38] Document No. 31-2 ¶¶ 2-4.

[39] The cases on which the County relies to argue that standing cannot be based on the possibility that Plaintiffs will appear before a judge in the future are inapposite because they do not involve lawyers who routinely appear before the judge in conducting their law practice. See Soc'y of Separationists, Inc. v. Herman, 959 F.2d 1283, 1285 (5th Cir. 1992) (en banc) ("The chance that [plaintiff] will be selected again for jury service and that Judge Herman will be assigned again to oversee her selection as a juror is slim."); Henok v. Kessler, 78 F. Supp. 3d 452, 464 (D.D.C. 2015) (litigant lacked standing to seek injunctive relief where his complaints "arise solely from his past interactions with Judge Bayly, and Judge Bayly is no longer assigned to Dr. Araya's case," and "it is wholly speculative whether Dr. Araya will ever appear before Judge Bayly again"), aff'd sub nom. Araya v. Kessler, No. 15-7021, 2015 WL 5210518 (D.C. Cir. Aug. 12, 2015); Medina v. Devine, No. 4:96-cv-2485, ECF No. 44 (S.D. Tex. Apr. 2, 1997) (Harmon, J.) (dismissing as moot litigants' challenge to display of

16

Plaintiff Doe provides declaration testimony that she has appeared before Judge Mack at least three times; that she was exposed to the clergy-led prayer each time; that she now actively avoids taking on new clients with cases that will be heard by Judge Mack; that she has turned down three potential clients for this reason, causing her financial loss; and that she would appear before Judge Mack again if required by her duties to her existing clients.[40]  In light of Doe's efforts to avoid appearing before Judge Mack, it does not appear that further exposure to Judge Mack's prayer practice is "certainly impending."  However, as noted above, the Supreme Court has "found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."  Clapper, 133 S. Ct. at 1150 n.5 (collecting cases); see also, e.g., Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2754-55 (2010) (farmers had standing to challenge deregulation of genetically modified alfalfa because measures taken in response to substantial risk of crop contamination were injury in fact).  The County correctly argues that Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their

---

religious pictures in courtroom where case had been reassigned to different judge and there was "no reasonable expectation" that plaintiffs would file another suit that would be assigned to the same judge), aff'd, 146 F.3d 868 (5th Cir. 1998) (unpublished).

[40] Document No. 31-3.

fears of hypothetical future harm that is not certainly impending." Clapper, 133 S. Ct. at 1151. In Clapper, the plaintiffs' theory of standing "relie[d] on a highly attenuated chain of possibilities [which] does not satisfy the requirement that threatened injury must be certainly impending." Id. at 1148.[41] Here, however, there is no similar attenuation. Plaintiffs have been exposed to Judge Mack's prayer practice at every appearance before him. Doe is a practicing attorney in Montgomery County, who appeared before Judge Mack multiple times before deciding actively to avoid Judge Mack's court and who has since turned down requests to represent clients before Judge Mack. Because there is a "substantial risk" that Doe will be exposed to Judge Mack's prayer practice if she does not continue to turn down clients with cases before him, Doe's injury is not self-inflicted and she has standing to seek prospective relief. Id. at 1150 n.5.

In contrast, there is no indication that Noe, who evidently is not an attorney, has appeared before Judge Mack since August 2014,

---

[41] The Clapper plaintiffs' theory of standing required that: (1) the Government would decide to target the communications of non-U.S. persons with whom they communicated; (2) in doing so, the Government would choose to invoke its authority under the challenged statute instead of using another method of surveillance; (3) the judges on the Foreign Intelligence Surveillance Court would conclude that the Government's proposed surveillance procedures satisfied the statute's many safeguards and the Fourth Amendment; (4) the Government would succeed in intercepting the communications of the plaintiffs' contacts; and (5) the plaintiffs would be parties to the particular communications that the Government intercepted. 133 S. Ct. at 1148.

or that she has any reason to expect to appear before Judge Mack again. Indeed, Plaintiffs appear to concede that Noe is not suffering ongoing harm or likely future harm.[42] Accordingly, Plaintiffs have not met their burden to establish that Noe has standing to pursue prospective injunctive and declaratory relief.

### 3.    FFRF's Associational Standing

"[A]n association has standing to bring suit on behalf of its members when:  (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advert. Comm'n, 97 S. Ct. 2434, 2441 (1977).  It is undisputed, and the Court holds, that the interests FFRF seeks to protect are germane to its purpose of advocating for the separation of church and state and that the individual plaintiffs' participation is not required for FFRF's claim or for the declaratory and injunctive relief it seeks.  The County argues, however, that FFRF lacks associational standing because none of the individual members has standing, and also because the individual Plaintiffs did not allege

---

[42] Document No. 31 at 7 ("Unlike Ms. Noe, plaintiffs John Roe and Jane Doe are suffering actual ongoing harm and likely future harm, making prospective injunctive relief proper.").

19

that they joined FFRF before they were exposed to the prayers in Judge Mack's court.[43]

As discussed above, Plaintiffs Roe and Doe have standing. The County relies on a single out-of-circuit district court opinion for the proposition that FFRF cannot have associational standing if the individual Plaintiffs were not members at the time they observed the prayers. Nat. Arch & Bridge Soc'y v. Alston, 209 F. Supp. 2d 1207, 1219 (D. Utah 2002) (where the only individual plaintiff with standing did not join organization until after the event that gave him standing, "his alleged injury cannot be imputed to the association for purposes of standing"), aff'd, 98 F. App'x 711 (10th Cir. 2004) (holding that none of the plaintiffs had standing). Unlike the individual plaintiff in Alston, Plaintiffs Roe and Doe allege that they were injured after becoming members of FFRF.[44] See Hunt, 97 S. Ct. at 2441 ("Even in the absence of injury

---

[43] Document No. 29 at 11-12 (incorporating arguments at Document No. 15-3).

[44] All three individual Plaintiffs were members of FFRF at the latest by June 7, 2017, when they filed their First Amended Complaint. Since then, Roe has been exposed to Judge Mack's prayer practice at least three times and Doe continues to decline accepting as clients those whose cases would require her to appear before Judge Mack. Document Nos. 31-2, 31-3. Moreover, the fact that Doe and Roe did not allege their membership in FFRF in their Original Complaint is immaterial because "the question whether a plaintiff has standing is evaluated as of the time the operative complaint is filed." Hunter v. Branch Banking & Tr. Co., No. 3:12-CV-2437-D, 2013 WL 4052411, at *3 n.4 (N.D. Tex. Aug. 12, 2013) (Fitzwater, C.J.) (citing, inter alia, Cty. of Riverside v. McLaughlin, 111 S. Ct. 1661, 1667 (1991) (analyzing standing as of the time the "second amended complaint was filed")).

20

to itself, an association may have standing solely as the representative of its members. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.") (quoting Warth v. Seldin, 95 S. Ct. 2197, 2211-12 (1975)). Accordingly, FFRF has associational standing.

## IV. Motion to Dismiss for Failure to State a Claim

### A. Legal Standard

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one. *See* Scheuer v. Rhodes, 94 S. Ct. 1683, 1686 (1974), *abrogated on other grounds by* Harlow v. Fitzgerald, 102 S. Ct. 2727 (1982). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support the claims. Id. "Motions to dismiss under Rule 12(b)(6) 'are viewed with disfavor and are rarely granted.'" Lormand v. US Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted).

In considering a motion to dismiss under Rule 12(b)(6), the district court must construe the allegations in the complaint

21

favorably to the pleader and must accept as true all well-pleaded facts in the complaint. *See* <u>Lowrey v. Tex. A&M Univ. Sys.</u>, 117 F.3d 242, 247 (5th Cir. 1997). To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009). While a complaint "does not need detailed factual allegations . . . [the] allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Twombly</u>, 127 S. Ct. at 1964-65 (citations and internal footnote omitted).

## B.   Discussion

The County argues that Plaintiffs have not stated a plausible claim for violation of the Establishment Clause because Judge Mack's courtroom prayer practice is in keeping with a longstanding tradition of governmental prayer, and that Plaintiffs have not alleged facts showing that the County is liable for any violation.[45]

---

[45] Document No. 29 at 12 (incorporating by reference Document No. 24 at 11-22); <u>id.</u> at 12-23.

1.   Establishment Clause Violation

"The Supreme Court generally applies at least one of three tests under the Establishment Clause:   the Lemon test, the endorsement test, and the coercion test."   Am. Humanist Ass'n v. McCarty, 851 F.3d 521, 525 (5th Cir. 2017) (footnotes omitted). Under the Lemon test, which is "the Establishment Clause test of longest lineage," "a government practice is constitutional if (1) it has a secular purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not excessively entangle government with religion."   Ingebretsen v. Jackson Pub. Sch. Dist., 88 F.3d 274, 278-79 (5th Cir. 1996) (citing Lemon v. Kurtzman, 91 S. Ct. 2105, 2111 (1971)).   "Under the endorsement test, a '[g]overnment unconstitutionally endorses religion whenever it appears to take a position on questions of religious belief, or makes adherence to a religion relevant in any way to a person's standing in the political community,'" which it does "when it conveys a message that religion is favored, preferred, or promoted over other beliefs."   McCarty, 851 F.3d at 525 n.11 (quoting Ingebretsen, 88 F.3d at 280).[46]

---

[46] The coercion test, which "analyzes school-sponsored religious activity in terms of the coercive effect that the activity has on students," is inapplicable here.   Briggs v. Mississippi, 331 F.3d 499, 505 (5th Cir. 2003) (explaining that coercion test "is facially inapplicable" in Establishment Clause challenge to state flag and applying Lemon test).

The parties devote little attention to these traditional Establishment Clause tests.    Instead, the County's principal argument is that these tests are unnecessary because the historical approach used to uphold the constitutionality of legislative prayer in Marsh v. Chambers, 103 S. Ct. 3330 (1983), applies equally to Judge Mack's prayer practice.

In Marsh, the Supreme Court considered the Nebraska legislature's practice of opening each session with a prayer by a chaplain, which the Eighth Circuit had held unconstitutional under the Lemon test.    Without discussing Lemon, the Court surveyed the "unique history" of legislative prayer, explaining that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country.    From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom."    Id. at 3333.    The Court described the First Congress's policy of opening each session with prayer by a chaplain and its enactment of a statute providing for payment of those chaplains three days before final agreement on the language of the Bill of Rights was reached.    Id. at 3334.    "Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without

24

interruption ever since that early session of Congress" and "has also been followed consistently in most of the states." Id. at 3334-35.  The Court held that "[i]n light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." Id. at 3336.

The Court again followed this historical approach when it upheld as constitutional the practice of opening town board meetings with prayer by local clergy.  Town of Greece, N.Y. v. Galloway, 134 S. Ct. 1811 (2014).  Justice Kennedy, writing for the Court, explained that "Marsh stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted. Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." Id. at 1819.  Looking to historical practice, the Court noted that "[t]he Congress that drafted the First Amendment would have been accustomed to invocations containing explicitly religious themes of the sort respondents find objectionable." Id.  Although differing in their views on the role of coercion in the Establishment Clause analysis, five Justices agreed that the Town of Greece's practice passed constitutional muster. See id. at 1828 (Kennedy, J., joined as to Part II-B by

Roberts, C.J., and Alito, J.); id. at 1835 (Thomas, J., joined by Scalia, J., concurring in part and concurring in the judgment).

The County argues that under Marsh and Town of Greece, the history and tradition of judicial prayer establishes that Judge Mack's prayer practice is constitutional because it fits within the nation's and Texas's "long tradition of governmental prayer that began before and continued through and after the ratification of their respective Constitutions."[47]

The County has not cited--and the Court is unaware of--any decisions applying the historical approach to uphold a judicial prayer practice like Judge Mack's. The Fourth Circuit rejected this approach in North Carolina Civil Liberties Union Legal Foundation v. Constangy, 947 F.2d 1145 (4th Cir. 1991), which appears to be the only appellate decision addressing an Establishment Clause challenge to judicial prayer.[48] In holding Marsh inapplicable, the Fourth Circuit explained that "[u]nlike legislative prayer, there is no similar long-standing tradition of opening courts with prayer. Nor is there any evidence regarding the intent of the Framers of the Bill of Rights with regard to the opening of court with prayer. . . . [A] few examples of judges who

---

[47] Document No. 24 at 12.

[48] See Tex. Att'y Gen. Op. KP-0109, 2016 WL 4414588 (2016) ("We have found no federal appellate decisions that have directly analyzed courtroom prayer under the Establishment Clause in the twenty-five years since Constangy was issued.").

26

open court with prayer is hardly comparable to the common practice of opening sessions of legislatures with prayer." Id. at 1148-49. The court also noted important concerns unique to judicial prayer that further counseled against comparison with legislative prayer:

> A judge opening court with prayer presents an issue that is markedly different from a chaplain opening legislative sessions with prayer. First, legislative prayer is primarily directed at the legislators themselves, who have decided to have prayer. . . . In contrast to legislative prayer, a judge's prayer in the courtroom is not to fellow consenting judges but to the litigants and their attorneys. Moreover, a judge presiding over a court is the court. For a judge to engage in prayer in court entangles governmental and religious functions to a much greater degree than a chaplain praying before the legislature. Most importantly, unlike judges, legislators do not have an obligation to be neutral. A legislature is by its very nature partisan and political. Legislators are elected representatives and have a duty to support the interests and viewpoints of their constituents. Thus, in marked contrast to a judge, a legislator has the role of advocate. Because a judge must be a neutral decisionmaker, prayer in court by a judge has far more potential for establishing religion than legislative prayer.

Id. at 1149. The court then went on to hold that the judge's prayers failed each prong of the Lemon test. Id. at 1150-52.

The County relies on various examples of judicial prayer as evidence of historical practice not presented to the Constangy court. Plaintiffs properly object that such evidence is outside the pleadings and, to the extent it is not a proper subject of judicial notice, may not be considered in ruling on the County's Rule 12(b)(6) motion. Collins v. Morgan Stanley Dean Witter, 224

F.3d 496, 498 (5th Cir. 2000). The Court takes judicial notice, however, of the longstanding practice in many courts of opening court with a cry that mentions God. The Supreme Court has repeatedly referred to its own practice of opening with an announcement that concludes, "God save the United States and this Honorable Court," *see, e.g.*, Marsh, 103 S. Ct. at 3333, and this Court, like many others, employs this traditional ceremonial opening recitation.[49]

Such cries with their recited mention of "God" are in no realistic way comparable to the sectarian Bible readings, sermons, and prayers that Plaintiffs allege Judge Mack requires and oversees in his courtroom.[50] *See* Constangy, 947 F.2d at 1151 (rejecting analogy to the Supreme Court's opening cry and noting that "prayer

_____

[49] The constitutionality of such cries has never, to the Court's knowledge, been the subject of a Supreme Court or appellate opinion, but they have been mentioned in Establishment Clause decisions as examples of routine and long-accepted public references to God. *E.g.*, Town of Greece, 134 S. Ct. at 1825 (Kennedy, J.) ("As a practice that has long endured, legislative prayer has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of 'God save the United States and this honorable Court' at the opening of this Court's sessions."); *see also* Constangy, 947 F.2d at 1151 (The Supreme Court cry's "brief references to God have been repeated so often that their religious meaning has diminished so that they are merely examples of 'ceremonial deism.'").

[50] Plaintiffs allege that a typical opening prayer in Judge Mack's courtroom consisted of a "sermon" and reading from the Bible for five to eight minutes, followed by a Christian prayer, "in the name of Jesus," during which all present were asked to bow their heads. Document No. 22 ¶¶ 31-33, 60.

28

in the courtroom by a judge is a religious act by a government official with little historical support.  It cannot be considered mere 'ceremonial deism.'").

The Supreme Court's opinions in <u>Town of Greece</u> further undercut the County's attempt to conflate judicial prayer with legislative prayer.  Justice Kagan in her dissenting opinion (joined by Justices Ginsburg, Breyer, and Sotomayor) presented a series of hypothetical scenarios that she had "every confidence the Court would agree" crossed a constitutional line, beginning with:

> You are a party in a case going to trial. . . .  The judge bangs his gavel to call the court to order, asks a minister to come to the front of the room, and instructs the 10 or so individuals present to rise for an opening prayer.  The clergyman faces those in attendance and says:  "Lord, God of all creation, . . . .  We acknowledge the saving sacrifice of Jesus Christ on the cross.  We draw strength . . . from his resurrection at Easter.  Jesus Christ, who took away the sins of the world, destroyed our death, through his dying and in his rising, he has restored our life.  Blessed are you, who has raised up the Lord Jesus, you who will raise us, in our turn, and put us by His side. . . .  Amen."  The judge then asks your lawyer to begin the trial.

134 S. Ct. at 1842 (Kagan, J., dissenting) (record citation omitted).  Justice Alito, in his concurring opinion joined by Justice Scalia, expressed direct concerns about this hypothetical:

> [T]he principal dissent conjures up the image of a litigant awaiting trial who is asked by the presiding judge to rise for a Christian prayer . . . .  I am concerned that at least some readers will take these hypotheticals as a warning that this is where today's

29

decision leads--to a country in which religious minorities are denied the equal benefits of citizenship.

Id. at 1834 (Alito, J., concurring).[51] Thus, at least six justices have recently suggested that a hypothetical judicial prayer rather similar to Judge Mack's alleged prayer practice would be unconstitutional. The remaining three justices did not suggest otherwise.

The traditional Establishment Clause tests, on which the parties have not focused, confirm that Plaintiffs have stated a plausible claim that Judge Mack's prayer practice is unconstitutional. Plaintiffs have plausibly alleged that the prayers fail under all three prongs of the Lemon test, any one of which would render the practice unconstitutional. Judge Mack's letter to his supporters regarding his prayer practice, which is attached as part of Plaintiffs' pleading, does not mention any secular purpose but states that "I want to make a statement to show . . . that God has a place in all aspects of our lives and public service."[52] Hence, Plaintiffs have plausibly alleged that the prayers lack a secular purpose. See Constangy, 947 F.2d at 1150

---

[51] Additionally, when discussing the prayer at the board meeting, Justice Alito emphasized that "I do not understand this case to involve the constitutionality of a prayer prior to what may be characterized as an adjudicatory proceeding. The prayer preceded only the portion of the town board meeting that I view as essentially legislative." Town of Greece, 134 S. Ct. at 1829 (Alito, J., concurring).

[52] Document No. 22-1 at 6.

("[C]ontrolling caselaw suggests that an act so intrinsically religious as prayer cannot meet, or at least would have difficulty meeting, the secular purpose prong of the Lemon test."). Plaintiffs have also plausibly alleged that "the primary effect of Defendants' courtroom prayer practice is to advance religion in general, and Christianity specifically, through the machinery of the judiciary,"[53] id. at 1151 (primary effect of courtroom prayers was to advance and endorse religion), and that "[d]ue to the prayer practice, Montgomery County and the Justice of the Peace Precinct 1 courtroom have become excessively entangled with an exclusively religious ritual,"[54] id. ("[W]hen a judge prays in court, there is necessarily an excessive entanglement of the court with religion.").

Plaintiffs have also plausibly alleged that Judge Mack's practice of opening court with prayer, established after he campaigned "on a platform of reinstituting religious values within the office,"[55] "conveys a message that religion is favored, preferred, or promoted over other beliefs" so as to violate the endorsement test. McCarty, 851 F.3d at 525 n.11; see also McCreary County v. ACLU, 125 S. Ct. 2722, 2733 (2005) ("When the government acts with the ostensible and predominant purpose of advancing

---

[53] Document No. 22 ¶ 64.

[54] Id. ¶ 65.

[55] Id. ¶ 20.

31

religion, it violates [the] central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides.") (citation omitted). Accordingly, Plaintiffs have adequately alleged that Judge Mack's prayer practice violates the Establishment Clause.[56]

## 2. Municipal Liability

A municipality can be held liable under § 1983 only when the municipality itself causes a constitutional deprivation. *See* City of Canton v. Harris, 109 S. Ct. 1197, 1203 (1989); Monell v. Dept. of Soc. Servs., 98 S. Ct. 2018, 2037-38 (1978). This requires the execution of an official municipal policy or custom which results in the injury made the basis of the § 1983 claim. Bd. of County

---

[56] The County argues that Judge Mack's prayer practice is voluntary and not coercive, but coercion is not a necessary element of an Establishment Clause claim under the Lemon test or the endorsement test. Moreover, to the extent that coercion may be relevant, the County's argument fails, at least at the pleading stage. Plaintiffs allege that Judge Mack does not bow his head during the prayers but instead observes those present in the courtroom, and that he began locking his doors--which no other justice of the peace in Montgomery County or the surrounding counties does--during prayer when he revised his prayer practice, allowing him easily to determine who has left the courtroom during the prayers. Document No. 22 ¶¶ 33, 53-54. Moreover, the Court granted Plaintiffs' unopposed motion for leave to proceed using pseudonyms, based in part on Plaintiffs' fear of retaliation after Judge Mack during the state investigation tried to identify FFRF's complainant and publicly characterized FFRF's complaint as an "attack" on religion. Document Nos. 18-20. Under these circumstances, Plaintiffs have plausibly alleged a reasonable concern that conspicuously abstaining from Judge Mack's prayer practice would draw his attention to them in an unfavorable way.

Comm'rs v. Brown, 117 S. Ct. 1382, 1388 (1997); Monell, 98 S. Ct. at 2035-36. Proof of municipal liability sufficient to satisfy Monell requires: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002). Because Plaintiffs have sued Judge Mack only in his official capacity, all of Plaintiffs' claims require them to establish municipal liability. *See* Kentucky v. Graham, 105 S. Ct. 3099, 3105 (1985) ("[I]n an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law."). The County argues that Plaintiffs' claim fails because Judge Mack is not a policymaker for the County and Plaintiffs have not alleged a policy or practice attributable to the County.[57]

Plaintiffs have adequately alleged that Judge Mack has an ongoing practice of opening court with prayer, which he also announces as the policy of Precinct 1 in signs around his courtroom, and that this practice is the moving force behind Plaintiffs' alleged injuries. The question is whether the practice is an official policy attributable to the County through its policymaker.

---

[57] Document No. 29 at 12-22.

Plaintiffs' argument that Judge Mack is the relevant policymaker for the County is not correct. The Fifth Circuit and district courts in Texas have uniformly held that justices of the peace are not county policymakers. Bigford v. Taylor, 834 F.2d 1213, 1222 (5th Cir. 1988) ("Judge Buckner, however, was not the Galveston County Judge, but a justice of the peace for one precinct of the county. His job is to adjudicate various small claims such as the question of vehicle ownership presented here, and it does not involve any of the policymaking functions assigned to the county judge."); Sullo & Bobbitt, PLLC v. Abbott, No. 3:11-CV-1926-D, 2013 WL 1949835, at *5 (N.D. Tex. May 13, 2013) (Fitzwater, C.J.) ("While Justice Jones may have independent discretion to control the release of [records from his court], there is no allegation that he sets such a policy for the county as a whole. Furthermore, courts have consistently held that Texas justices of the peace do not make county policy.") (collecting cases); Tinoco v. Raleeh, No. 4:05-CV-367, 2006 WL 27287, at *3 (E.D. Tex. Jan. 5, 2006) (no county liability because "[t]he Fifth Circuit has found that, unlike that of a County Judge, the job of a Texas Justice of the Peace does not involve policymaking functions, but primarily involves the adjudication of small claims") (citations omitted); Collard v. Hunt Cty., No. CIV. A. 300CV1372-BC, 2001 WL 1012695, at *3 (N.D. Tex. Aug. 21, 2001) ("[T]he Court finds that Judge Keck was not a County policymaker

34

when he ordered private citizens to forcibly remove the Collards and their personal belongings from the Property. Judge Keck is a justice of the peace for one precinct of Hunt County. His job is to adjudicate small claims, including claims seeking possession of property.").[58]

Plaintiffs argue in the alternative that the County is liable for Judge Mack's prayer practice because the Montgomery County Commissioners Court--the actual policymaker for the County--has actual or constructive knowledge of Judge Mack's prayer policy and practice.[59] An official policy for which a municipality is liable can include

> [a] persistent, widespread practice of [municipal] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly

---

[58] At oral argument, Plaintiffs' counsel acknowledged that he was unaware of any cases holding that a justice of the peace could be a policymaker. Counsel relied on Familias Unidas v. Briscoe, 619 F.2d 391 (5th Cir. 1980), under which an elected county judge in Texas may be considered a policymaker in the performance of certain non-judicial functions, but the Fifth Circuit in Bigford distinguished Familias Unidas and held it inapplicable to a justice of the peace. Bigford, 834 F.2d at 1222.

[59] Plaintiffs' First Amended Complaint does not refer to the County Commissioners Court, although it does allege that "[t]he prayer practice itself is an established policy of Montgomery County, implemented within the Justice of the Peace Precinct 1." Document No. 22 ¶ 18. The Fifth Circuit recently held that "the specific identity of the policymaker is a legal question that need not be pled; the complaint need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." Groden v. City of Dallas, 826 F.3d 280, 284 (5th Cir. 2016).

35

represents municipal policy.  Actual or constructive
knowledge of such custom must be attributable to the
governing body of the municipality or to an official to
whom that body had delegated policy-making authority.

Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc).

Viewing the pleadings in the light most favorable to Plaintiffs, Plaintiffs have alleged facts sufficient to raise a plausible inference that Judge Mack's prayer practice "is so common and well settled as to constitute a custom that fairly represents municipal policy" within Precinct 1 and that the County Commissioners Court has actual or constructive knowledge of the practice.  Plaintiffs allege that Judge Mack has opened his court with prayer by an invited chaplain at every court session for more than three years; that the County administers the chaplaincy program by maintaining a list of eligible chaplains, reviewing applications to become an eligible chaplain, and training those who have applied; that bailiffs--evidently employees of the County--assist Judge Mack in the implementation of his prayer practice; and that the Justice of the Peace Precinct 1 building, which the parties agree is County property, contains at least two signs outside the courtroom and two messages on screens inside "declaring that it is the official policy or practice of the Precinct 1 court to include prayer at the start of court proceedings."[60]  Under these

---

[60] Document No. 22 ¶¶ 17, 25, 45-46, 56.  Plaintiffs in their response brief also rely on evidence of publicity surrounding Judge

circumstances, it is plausible that the County Commissioners Court is at least constructively aware of Judge Mack's persistent practice of opening court with prayer. *See* <u>Hicks-Fields v. Harris Cty.</u>, 860 F.3d 803, 808-09 (5th Cir. 2017) ("Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." (citation omitted)), *cert. denied*, No. 17-470, 2017 WL 4339261 (Dec. 4, 2017).

The County argues that Plaintiffs cannot establish a widespread practice attributable to the County because Judge Mack's prayer practice is limited to Precinct 1, one of five justice of the peace precincts in Montgomery County.[61] However, there is no requirement that a practice exist throughout the entire County in order for the County to be liable. *Cf.* <u>Adickes v. S. H. Kress & Co.</u>, 90 S. Ct. 1598, 1616-17 (1970) ("[B]oth the District Court and the majority opinion in the Court of Appeals suggested that petitioner would have to show that the relevant custom existed

---

Mack's prayer practice and of support given to him by members of the County Commissioners Court and other County officials, Document No. 31 at 18-20, but these matters are outside the pleadings and therefore not proper to consider on a Rule 12(b)(6) motion.

[61] Document No. 29 at 19-22.

throughout the State, and that proof that it had the force of law in Hattiesburg--a political subdivision of the State--was insufficient.  This too we think was error.  In the same way that a law whose source is a town ordinance can offend the Fourteenth Amendment even though it has less than state-wide application, so too can a custom with the force of law in a political subdivision of a State offend the Fourteenth Amendment even though it lacks state-wide application.").  Moreover, at the pleading stage, even a small number of violations has been found sufficient for a municipal liability claim to survive dismissal.  *See* <u>Carr v. Montgomery Cty.</u>, 59 F. Supp. 3d 787, 802 (S.D. Tex. 2014) (Miller, J.) ("Defendant is correct that plaintiff does not provide the court an estimate of the number of times [the challenged] conduct has occurred throughout the precinct, or facts regarding the size of the precinct or county or the amount of crime.  This type of context can be critical when considering a claim in a motion for summary judgment setting.  However, the four specific instances shown in Exhibit 4 that accompany plaintiff's pleadings are sufficient to state a claim for municipal liability at the pleading stage.") (internal citations omitted).  Plaintiffs' allegations that Judge Mack, as one of five Justices of the Peace for the County, has been engaging in the prayer practice at every court session for more than three years and has prominently and publicly announced it as the official policy of Precinct 1 are sufficient to

38

state a claim against the County based on a persistent, widespread practice of violating the Establishment Clause.

## V. Order

It is therefore

ORDERED that Defendant Montgomery County's Motion to Dismiss Pursuant to Rule 12(b)(1) and Rule 12(b)(6) (Document No. 29) is GRANTED IN PART as to the claims of Plaintiff Jane Noe, which claims are DISMISSED without prejudice for lack of subject matter jurisdiction, and the motion is otherwise DENIED.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 19TH day of January, 2018.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE